```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MISSOURI
                         EASTERN DIVISION
```

UNITED STATES OF AMERICA,  )
                           )
            Plaintiff,     )
                           )
      v.                   )     No. 4:11 CR 29 SNLJ / DDN
                           )
COREY EXUM,                )
                           )
            Defendant.     )

## ORDER AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This action is before the court upon the pretrial motions of the parties which were referred to the undersigned United States Magistrate Judge under 28 U.S.C. § 636(b). An evidentiary hearing was held on April 12, 2011.

Pending before the court are the oral and written motions of defendant Corey Exum to suppress evidence (Docs. 14, 21) and for disclosure of any confidential informant (Doc. 22), and the oral motion of the government for a determination of the admissibility of arguably suppressible evidence (Doc. 15).

## I. MOTION FOR DISCLOSURE OF CONFIDENTIAL INFORMANT

Defendant Exum has moved for disclosure of the confidential informant. At the hearing, counsel for the United States stated that the government would disclose to the defendant the name of the confidential informant. Therefore, the motion of defendant for disclosure will be denied as moot.

## II. MOTIONS TO SUPPRESS EVIDENCE

Defendant Exum has moved to suppress his statements he made to the police on September 7, 2010 and the physical evidence seized on that day. From the evidence adduced at the evidentiary hearing, the undersigned makes the following findings of fact and conclusions of law:

**FACTS**

1. On September 7, 2010, St. Louis Metropolitan Police Detective Terron Murphy[1] received a phone call from a confidential informant (CI)[2] that a man known as "C" was selling drugs and storing guns in his residence at 4956 Aubert Court in the City of St. Louis. CI told Det. Murphy that earlier that day he/she bought drugs from C and that he/she was upset because the drugs turned out to be bad.[3] CI described C as a black man, dark complected, with long dreadlocks, medium build, and wearing a white tank-top style shirt. CI also described C's pants.[4] CI also told the officer where C lived and described how C went about his business selling drugs, where he came out of the residence, and where he went. Det. Murphy passed this information on to his partner, Det. Michael Shaw, and other officers in his group. The officers made a plan to investigate CI's information about C. Later on September 7, 2010, CI called Det. Murphy and told him that he had arranged[5] to buy drugs from C again that day.

---

[1] Det. Murphy and his partner, Det. Michael Shaw, are assigned to the Narcotics and Gang Investigation unit in the North Patrol area of the City of St. Louis. In their careers, the detectives have been involved in many narcotics and firearms investigations.

[2] This informant had worked with Dets. Murphy and Shaw for a couple of months before September 7, 2010, and had provided them with reliable information. CI was a "documented" informant; he/she had signed a document agreeing to be a police informant. In earlier investigations, CI had been paid a total of $140.00. Det. Shaw testified that police funds were expended in this investigation of Exum. CI has not worked with Det. Shaw for a couple of months prior to the suppression hearing.

[3] CI had, on his own and not part of a police investigation, made this purchase of narcotics from C. CI did not make this purchase at the request of the police.

[4] However, at the hearing Det. Murphy could not remember how CI described C's pants.

[5] CI had decided on his own to buy drugs from C again. However, CI agreed to work with the police when he went to get the drugs from C. The police did not provide CI with money for the new heroin buy. And the detectives instructed CI to drive away from the area when C approached with the drugs.

2.  Dets. Murphy and Shaw and other officers went to the area of C's residence. The residence was in a two-unit brick, two story, residence building at 4956-4958 Aubert Court in the City of St. Louis. The back porch[6] of this building shelters the back door entrances of the two units, 4956 and 4958. The building and the back yard are adjacent to an alley; the door at 4958 is closer to the alley than 4956. A wooden fence, approximately 6 feet tall, with an open gate area midway down the fence, separates the back yard from the alley. Across the alley from this back yard is a parking lot situated behind a grocery store that fronts onto Aubert Court. Dets. Murphy and Shaw drove their unmarked police car into the parking lot and parked where they could and did view the back porch through the gate opening in the wooden fence. (Joint Ex. A (Def. Ex. B).)

3.  Soon after the detectives set up their surveillance, they saw CI drive up in his own vehicle, with a passenger, and park in the alley adjacent to the wooden fence, approximately 15 feet from the gate opening. After CI drove up, Dets. Murphy and Shaw saw a black male, later identified as defendant Corey Exum, walk out of one of the two back doors onto the porch of the residence.[7] Det. Murphy had never seen Exum

---

[6]In the photographic exhibits used by the parties in the suppression hearing, the two doors and the porch of the 4956-4958 portion of the building appear to be the rear of the building. Two separate sets of wooden stairs of 5 wooden steps lead from the back yard to the floor of the common porch and to the two entrance doors. (Joint Ex. A (Def. Ex. B) and Def. Ex. D.)

[7]Dets. Murphy and Shaw were inconsistent in their testimony about the address of the back door Exum came out to meet CI. Det. Murphy testified that Exum came out of the door on the left, the one farthest from the alley. On a porch pillar, this door is identified as "4956." Det. Murphy did not see Exum come out of the residence door on the right, which is the one nearest the alley and marked with the address "4958."

Initially, without referring to a hearing exhibit, Det. Shaw testified that Exum came out of 4956 Aubert. Det. Shaw testified he wrote the official police report of this investigation. The report records in several places "4958 Aubert Ct." as where the incident occurred. Det. Shaw testified that "4958" was erroneously recorded as the incident location. He believed that, when the information about the incident was called in to the dispatcher, "4958" was mistakenly recorded.
(continued...)

before.  Exum at first stood in the doorway and looked around.  When they saw Exum come out onto the porch and start to walk toward the alley and CI's car, Dets. Murphy and Shaw[8] got out of their vehicle, believing that the drug transaction was about to happen, and walked toward Exum.  Det. Murphy could see Exum through the open gate area in the wooden fence.  The officers saw that he looked like the black man CI had described as C; Exum wore the clothing that CI had described and his hair was in dreadlocks.  The officers saw that Exum appeared to be counting something in his hand as he walked to CI's car in the alley.

    4.    As Exum walked toward CI's car, Exum was concentrating on what he had in his hand.  The detectives approached him and from about 10 feet away announced, "Police."  This startled Exum.  He immediately exclaimed, "You all set me up," and dropped what he had in his hand onto the ground near his feet.  Det. Murphy immediately picked up the item, which was a clear plastic baggie of capsules.  From his experience and familiarity with heroin, Det. Murphy believed the baggie contained a quantity of

---

[7](...continued)
Then "4958" remained in the computer and was recorded on the face sheet of the police report.  On the subsequent pages of the report, Det. Shaw mistakenly used "4958" as the relevant address.  He did not catch the mistake before the report was submitted to his supervisor.  Later in the report, Det. Shaw reported the relevant address as "4956" inconsistently with the earlier address recorded in the report.  Because the police report document was used only to refresh memory and was not offered or received into evidence, the undersigned has not otherwise used it to make the relevant findings of fact.

When referring to Defendant's Exhibit D, a photo of the two doors, Det. Shaw testified twice that Exum came out of the building through the door nearest the alley, which has the 4958 address on Joint Exhibit A and Defendant's Exhibit D.

[8]The detectives were dressed in civilian clothes, but outside their clothing they wore bullet-proof vests on which was clearly marked the word "POLICE."  Each also wore his police badge which hung from the front of his vest.

heroin in gel capsules.  Det. Shaw immediately arrested Exum; the time of arrest was 8:01 p.m.[9]

5. Exum was then handcuffed and placed in the back seat of the detectives' car. Next, Det. Shaw orally advised Exum of his constitutional rights to remain silent and to counsel, reading them to him from a printed card.

6. Because Exum had been seen coming out of his apartment, the officers believed that there could be firearms and drugs inside the apartment. Therefore, Det. Shaw prepared a preprinted Consent to Search form, Government Exhibit 1. He handwrote Exum's name, the two detectives' names, and the place to be searched, "4956 Aubert Ct.," on the form. The form expressly gave Dets. Shaw and Murphy permission to search the apartment located at 4956 Aubert Ct. (Gov. Ex. 1.) Det. Shaw handed the form to Exum and said, "This is a basic consent to search form for a residence. Do you have any problem with us searching your residence?" Exum said, "No," read the filled-in form, and signed it. (Id.) At no time did the police threaten, coerce, or make any promise to Exum to get him to sign the form and consent to the police searching his residence.

7. Then the detectives and other officers took Exum back to the apartment he had come out.[10] They all entered through the door which was found to be open. When they entered the residence, no officer had his firearm drawn. The apartment had three levels. Upstairs were two bedrooms. The entry level had a kitchen and a living room. Downstairs was the basement.

8. As soon as he entered the apartment, Det. Murphy saw a pistol-grip shotgun leaning against the wall right next to the door they had entered. He immediately seized the shotgun, made it secure, took it outside, and placed it in the trunk of his police car. On the floor near

---

[9]This time was after sunset. The area, however, was illuminated by street lights.

[10]There is inconsistent testimony about which apartment was searched. Det. Murphy testified that the police entered 4956 and searched it. Det. Shaw testified that the police entered 4958, the door closest to the alley, as depicted in Defendant's Exhibit D, and searched that apartment.

where the shotgun had been were more gelcaps and a bag of shotgun shells; these items were seized.

9.   Two other individuals were inside the apartment when the police entered.  Exum and the two others were handcuffed and placed in the living room while the police conducted the search.  There Det. Murphy obtained from the three their pedigree information.  Throughout the search, Exum remained cooperative with the police.

10.   Det. Shaw searched the bedrooms upstairs.  One bedroom had children's toys in it.  On the floor of the other bedroom he found and seized a grinder, gel capsules, drug paraphernalia (including a razor blade and a tooth brush), and a baggie containing a quantity of heroin in brown powder form.  In an open shoebox on a window sill, Det. Shaw saw and seized photos of Exum and a wallet with Exum's identification.  This bedroom contained adult men's clothing.

11.   After the search was completed, Dets. Shaw and Murphy took Exum to the north patrol police station;[11] Exum made no statement during the ride to the police station.  At the police station, he was placed in an interview room.  There Det. Shaw again orally advised Exum of his constitutional rights to remain silent and to counsel by reading them to him from a card.

12.   Next, Det. Shaw handed Exum a printed Warning and Waiver form which the detective read to him.  Det. Shaw handwrote Exum's biographical information at the top of the form, including Exum's name, race ("B"), gender ("M"), age ("31"), date of birth ("06/07/79"), and home address (4956 Aubert Ct.").  The middle portion of page 1 of the form (Part I) contained preprinted statements relating to the interviewee's understanding of each of his constitutional rights.  Exum placed his initials next to each of the statements of his rights.  Exum then signed the form, as did Dets. Murphy and Shaw as witnesses. (Gov. Ex. 2 at 1.)

13.   After Exum signed Part I of the form, Det. Shaw asked Exum whom the items that were seized from the house belonged to.  Exum

---

[11]During the search, the police determined that the other two persons in the apartment had no active warrants.  When the search of the residence was finished, these two were allowed to leave.  They were not arrested.

initially denied they were his. Then he admitted the items were all his. He said he kept the shotgun as protection for his house. He said he lived there with his girlfriend, who was then in the hospital in labor to give birth.

 14. Next, on page 1 of the Warning and Waiver form, Exum filled in his name and handwrote this statement:

> My girlfriend had no knowledge of the weapon inside the house. She is in the hospital having a baby. I only had it for protection in the area where she lives. It would never be used to intentionally hurt any one, only to protect the family.

(Id. at 2.) At the bottom of page 1 of the Warning and Waiver form, Exum filled in his name and signed his name below the following statement:

> I, "Corey Exum", have read, or have had read to me, this statement which begins on page 1 and ends on page 2. I fully understand the contents of this entire statement made by me. The statement is true. I have initialed all corrections and have signed the bottom of each page containing the Statement. I have made the statement freely without hope of reward or benefit, without threat of punishment, and without coercion, unlawful influence, or unlawful inducement.

(Id. at 1.)

 15. Exum made no statement to the police, other than the pre-arrest oral statement ("You all set me up") and the post-arrest oral and written statements regarding the items. Exum was never in any way threatened, coerced, or had promises made to him to induce him to consent to the search of the apartment or to make any statement on September 7, 2010.

### DISCUSSION

Defendant Exum argues that the police did not have probable cause to arrest him on September 7, 2010. In this regard, defendant argues that the confidential informant (CI), who provided the officers with their initial information about C and then worked with the police to have C come out of his residence intending to sell the confidential informant more heroin, was tainted by his admission to the police that he/she had illegally purchased heroin from C earlier in the day.

The government argues that the police had probable cause to arrest defendant Exum because he had possessed the heroin capsules Det. Murphy saw him drop to the ground.

**A.  Probable Cause to Arrest**

When the detectives approached defendant Exum for the first time, as defendant walked to CI's car, they exerted authority over him by calling out, "Police."  The detectives' seizure of defendant Exum was a permissive investigatory stop, because the detectives had reasonable suspicion to believe defendant Exum was engaging in criminal activity. Terry v. Ohio 392 U.S. 1, 30 (1968).  The detectives' reasonable suspicion was supported by the information the detectives had obtained from CI earlier.  "A confidential informant's tip may support a reasonable suspicion if it has sufficient indicia of reliability, such as the informant's track record as a reliable source or independent corroboration of the tip."  United States v. Manes, 603 F.3d 451, 456 (8th Cir. 2010).  The information provided by CI to the detectives was sufficiently reliable, because CI was a known informant with an, albeit brief, history of providing reliable information.  Further, the information CI provided about C was very specific and included information that even incriminated CI. Finally, the information provided by CI culminated in C's appearing as expected and looking the way CI had described him.  Therefore, the police had at least sufficient information to establish reasonably reliable, specific, articulable facts that indicated that C was engaged in criminal activity. See United States v. Bell, 480 F.3d 860, 863-64 (8th Cir. 2007).

The detectives had probable cause to arrest defendant Exum following the investigatory stop.  Probable cause to arrest with or without a warrant exists when the police have information sufficient to cause a reasonable person to believe that the defendant had committed or was committing an offense.  Beck v. Ohio, 379 U.S. 89, 91 (1964).  When evaluating the sufficiency of the information, the court must look at "the totality of the circumstances as set forth in the information available to the officers at the time of arrest."  United States v. Adams, 346 F.3d 1165, 1169 (8th Cir. 2003) (quotation omitted).

The detectives' observations following their arrival at defendant Exum's apartment quickly supplied probable cause to arrest defendant Exum. United States v. Newell, 596 F.3d 876, 880 (8th Cir. 2010). Upon announcing their presence, the detectives observed defendant Exum drop an object to the ground that the officers reasonably believed was a quantity of heroin. The officers' observation of defendant Exum's possession of heroin provided probable cause to arrest. Id. (bag of cocaine hanging out of defendant's pocket gave probable cause to arrest).

Further, the arrest was supported by the information the detectives had obtained from CI earlier. This information was sufficiently reliable because CI was a known informant who had provided reliable information in the past. United States v. Neal, 528 F.3d 1069, 1073-74 (8th Cir. 2008) (confidential informant had successfully completed one controlled narcotics purchase from the defendant). The information CI provided about C was very specific and included information that incriminated CI. United States v. Robertson, 39 F.3d 891, 893 (8th Cir. 1994). The information provided by CI was confirmed when defendant Exum appeared as expected and looking the way CI had described him. United States v. Webster, 625 F.3d 439, 444 (8th Cir. 2010); United States v. Brown, 49 F.3d 1346, 1349 (8th Cir. 1995) ("Corroboration is especially valuable in establishing the reliability of an informant's tip when predictive elements of the tip are corroborated."). Therefore, the police had at least sufficient information to establish reasonably reliable, specific, articulable facts that indicated that defendant Exum was engaged in criminal activity.

Therefore, the detectives lawfully arrested defendant Exum without a warrant.

**B.   Voluntariness of Statements**

Defendant argues that his oral and written statements were involuntary. He argues that the officers threatened that, unless he made his statements, they would take his children and his girlfriend's children from the residence and place them in foster care.

"Statements to law enforcement authorities are voluntary if they are the product of an essentially free and unconstrained choice by [their]

maker." United States v. Vinton, 631 F.3d 476, 482 (8th Cir. 2011) (internal citations omitted). "A statement is not considered involuntary unless the police extorted it from the accused by means of coercive activity." Id. "A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination." United States v. Boslau, 632 F.3d 422, 428 (8th Cir. 2011) (quotation omitted). Factors to consider include: "the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition." Id.

The government has met its burden of proving that defendant's oral and written statements were voluntary. There was no evidence adduced to the undersigned that any threats, alleged by defendant in his motion to suppress, were in fact made to defendant at any time. United States v. Gannon, 531 F.3d 657, 661-62 (8th Cir. 2008).

Further, the totality of the circumstances, as the government argues, support a finding of voluntariness. At the time he gave the statements, defendant Exum was 31 years old. Before giving his oral statement at the police station, he signed a printed Warning and Waiver form containing his Miranda rights, and signed his initials next to each right being waived. Williams v. Norris, 576 F.3d 850, 868 (8th Cir. 2009) ("[I]t is a rare case when a defendant can make a colorable argument that a self-incriminating statement was compelled despite the fact that the law enforcement authorities adhered to the dictates of Miranda."). Before giving his written statement, he signed an acknowledgment that his written statement was given "freely without hope of reward or benefit, without threat of punishment, and without coercion, unlawful influence, or unlawful inducement." The officers made no promises to defendant in return for his statements, and there is no evidence that defendant's statements were the products of undue coercion, excessive interrogation, or misunderstanding.

Therefore, the undersigned concludes that defendant Exum's statements were voluntary.

**C. Voluntariness of Consent**

"Although a warrantless search presumptively violates the Fourth Amendment, voluntary consent to a search is a well-recognized exception to the warrant requirement." United States v. Golinveaux, 611 F.3d 956, 959 (8th Cir. 2010). However, consent to search is valid only if it is voluntarily given, or "if the searching officer reasonably believes that the subject gave voluntary consent." United States v. Arreola, 250 Fed. App'x 765, 767 (8th Cir. 2007) (per curiam). The government bears the burden of proving the defendant voluntarily consented to the search. Golinveaux, 611 F.3d at 959.

When evaluating the voluntariness of a consent to search, the court must look to the totality of the circumstances under which the consent was given. United States v. Jimenez, 478 F.3d 929, 932 (8th Cir. 2007). "The ultimate question is whether the individual's will ha[s] been overborne and his capacity for self-determination critically impaired, such that his consent to search must have been involuntary." Vinton, 631 F.3d at 482 (internal citations omitted). The court must consider the suspect's characteristics and the environmental characteristics. United States v. Griffith, 533 F.3d 979, 984 (8th Cir. 2008). Suspects' characteristics include:

> (1) their age; (2) their general intelligence and education; (3) whether they were intoxicated or under the influence of drugs when consenting; (4) whether they consented after being informed of their right to withhold consent or of their Miranda rights; and (5) whether, because they had been previously arrested, they were aware of the protections afforded to suspected criminals by the legal system.

Id. Environmental characteristics include:

> [W]hether the person who consented (1) was detained and questioned for a long or short time; (2) was threatened, physically intimidated, or punished by the police; (3) relied upon promises or misrepresentations made by the police; (4) was in custody or under arrest when the consent was given; (5) was in a public or secluded place; or (6) either objected to the search or stood by silently while the search occurred.

Id.

Defendant argues that he gave the police consent to search the apartment residence at 4956 Aubert Court, but they instead searched the

- 11 -

residence at 4958, outside the scope of his consent.  The court is unable to make a clear finding of whether defendant came out of the apartment residence at 4956 or 4958, or whether the apartment residence at 4956 or the one at 4958 was the one ultimately searched by the police.  These findings, while perhaps important in the ultimate outcome of the case, are not determinative of whether defendant gave the officers voluntary consent to search his residence, whichever apartment it was.  Contemporaneous with seeking defendant Exum's written consent to search, Det. Shaw asked defendant Exum, "Do you have any problem with us searching your residence?"  Defendant Exum replied "No," read the filled-in consent to search form, and signed it.  See United States v. Black, 88 F.3d 678, 680-81 (8th Cir. 1996) (search was reasonable despite incorrect apartment number on the consent to search form).

Defendant argues that he did not sign the consent form voluntarily.  Rather, he argues, he did so because the officers threatened him with losing his children and his girlfriend's children.  However, as previously discussed, the record contains no evidence supporting defendant's contention that officers made such statement to him.

Defendant also argues that he was in custody and handcuffed when he consented to the search.  While this is true, it does not render his consent to search involuntary.  United States v. Comstock, 531 F.3d 667, 677 (8th Cir. 2008) ("[B]eing handcuffed does not preclude a finding of voluntariness.") (quotation omitted); United States v. Chaidez, 906 F.2d 377, 382 (8th Cir. 1990) ("[E]ven persons who have been arrested and are in custody can voluntarily consent to a search . . . .").

Further, the court finds and concludes that defendant Exum did voluntarily consent to the search in which the officers seized the subject items.  Det. Shaw orally advised defendant of his constitutional rights to remain silent and to counsel before seeking his consent to search.  Defendant Exum was 31 years old at the time, and there is no evidence that he was unable to understand, either due to intelligence or intoxication, the officers' request to search.  The officers made no threats, promises, or misrepresentations to obtain his consent.  Defendant Exum gave both verbal and written consent to search.  After consenting to the search, the detectives took defendant Exum with them

back to his apartment to conduct the search. At no time during the search did defendant Exum object to the search; defendant Exum was cooperative with the officers throughout the search. The totality of the circumstances establish that defendant Exum's consent to search was voluntarily given.

**D. Scope of Consent**

Defendant argues that, even if his consent was voluntary, the police exceeded the scope of the consent when they searched the box on the window sill in the bedroom. "A consensual search may not exceed to the scope of the consent given." United States v. Dinwiddie, 618 F.3d 821, 831 (8th Cir. 2010) (quotation omitted).

Defendant's consent was not limited in its scope. The consent to search form that defendant signed authorized the officers to search any area in his residence. When Det. Shaw orally asked defendant if he objected to the search, defendant responded, "No." Based on defendant Exum's conduct, the officers reasonably and correctly understood defendant Exum was permitting them to search his entire residence, including the open shoe box on the window sill in the bedroom. United States v. Coffman, 148 F.3d 952, 953 (8th Cir. 1998) (officers did not exceed scope of consent to search because the consent was "broad and unlimited"). Defendant Exum neither withdrew nor narrowed the scope of his consent to search. United States v. Parker, 412 F.3d 1000, 1002 (8th Cir. 2005).

Therefore, the officers did not exceed the scope of the scope of the consent to search when they searched inside the box on the window sill in the bedroom.

### III. CONCLUSION

For the reasons stated above,

**IT IS HEREBY RECOMMENDED** that the oral and written motions of defendant Corey Exum to suppress evidence (Docs. 14, 21) be denied.

**IT IS FURTHER RECOMMENDED** that the motion by the government for determination by the court of the admissibility of arguably suppressible evidence (Doc. 15) be denied as moot.

**IT IS HEREBY ORDERED** that the motion of defendant Corey Exum for disclosure of the confidential informant (Doc. 22) is denied as moot.

The parties are advised that they have 14 days to file written objections to this Order and Recommendation. The failure to file timely written objections may waive the right to appeal issues of fact.

　　　　　　　　　　　　　　　　　／S/　　David D. Noce　　　
　　　　　　　　　　　　　　　　**UNITED STATES MAGISTRATE JUDGE**

Signed on April 28, 2011.